**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| MAYA ARCE; her father and next best friend, SEAN ARCE, *Plaintiffs-Appellants/ Cross-Appellees*, v. DIANE DOUGLAS, Arizona Superintendent of Public Instruction, in her official capacity, ARIZONA STATE BOARD OF EDUCATION, AND MEMBERS OF THE ARIZONA STATE BOARD OF EDUCATION, *Defendants-Appellees/ Cross-Appellants*. | Nos. 13-15657 13-15760 D.C. No. 4:10-cv-00623-AWT OPINION |

On Appeal from the United States District Court
for the District of Arizona
A. Wallace Tashima, Senior Circuit Judge,[*] Presiding

Argued and Submitted
January 12, 2015—San Francisco, California

Filed July 7, 2015

---

[*] The Honorable A. Wallace Tashima, Circuit Judge for the U.S. Court of Appeals for the Ninth Circuit, sitting by designation.

Before: John T. Noonan and Richard R. Clifton, Circuit Judges, and Jed S. Rakoff, District Judge.[**]

Opinion by Judge Rakoff;
Partial Concurrence and Partial Dissent by Judge Clifton

**SUMMARY**[***]

**Civil Rights**

The panel affirmed in part and reversed in part the district court's summary judgment, and remanded in an action challenging Arizona revised statutes §§ 15-111 and 15-112, which were sponsored and implemented by the Arizona state superintendent of education, and which eliminated the Mexican American Studies program in Tucson public schools.

Pursuant to §§ 15-111 and 15-112, a school district or charter school is prohibited from including in its program of instruction any courses or classes that: (1) "Promote the overthrow of the United States government," (2) "Promote resentment toward a race or class of people," (3) "Are designed primarily for pupils of a particular ethnic group," or (4) "Advocate ethnic solidarity instead of the treatment of pupils as individuals." The parties did not dispute that the

---

[**] The Honorable Jed S. Rakoff, District Judge for the U.S. District Court for the Southern District of New York, sitting by designation.

[***] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

statute was enacted almost entirely with the Mexican American Studies program in mind, and that the program was the first and only ethnic studies program that has been found to be in violation of § 15-112.

The panel affirmed the district court's rulings that § 15-112(A)(3) is unconstitutional in violation of the First Amendment but severable from the rest of the statute; that §§ 15-112(A)(2) and (A)(4) are not overbroad in violation of the First Amendment; and that §§ 15-112(A)(2) and (A)(4) are not vague in violation of the Due Process Clause.

The panel reversed the district court's grant of summary judgment for defendants on plaintiffs' equal protection claim and remanded that claim for trial. The panel held that there were genuine issues of fact regarding whether the enactment and/or enforcement of § 15-112 was motivated at least in part by a discriminatory intent. Finally, the panel remanded plaintiffs' First Amendment viewpoint discrimination claim to the district court for further proceedings in accordance with its opinion.

Concurring in part and dissenting in part, Judge Clifton did not agree with the majority's conclusion that the equal protection claim must be remanded for trial. Judge Clifton stated that the equal protection claim should be remanded for further proceedings, without precluding further consideration of summary judgment.

**COUNSEL**

Erwin Chemerinsky (argued), University of California Irvine School of Law, Irvine, California; Richard M. Martinez, Law Office of Richard M. Martinez, Tucson, Arizona; Anjana Malhotra, SUNY Buffalo Law School, Buffalo, New York; Sujal J. Shah, Jennifer MikoLevine, and Marcelo Quiñones, Bingham McCutchen, LLP, San Francisco, California; Lorraine Bannai, Robert S. Chang, and Charlotte Garden, Fred Korematsu Center for Law and Equity, Ronald A. Peterson Law Clinic, Seattle University School of Law, Seattle, Washington, for Plaintiffs-Appellants/Cross-Appellees.

Thomas C. Horne, Arizona Attorney General, Jinju Park and Leslie Kyman Cooper (argued), Assistant Attorneys General, Office of the Arizona Attorney General, Phoenix, Arizona, for Defendants-Appellees/Cross-Appellants.

Meriem Hubbard and Ralph Kasarda, Pacific Legal Foundation, Sacramento, California, for Amicus Curiae Pacific Legal Foundation.

David Handzo, Julie Carpenter, and Elizabeth Bullock, Jenner & Block LLP, Washington, D.C., for Amici Curiae Freedom to Read Foundation, American Library Association, American Booksellers Foundation for Free Expression, Asian/Pacific American Librarians Association, Black Caucus of the American Library Association, Comic Book Legal Defense Fund, National Association for Ethnic Studies, National Coalition Against Censorship, National Council of Teachers of English, and Reforma.

Samantha Blevins, Arizona Education Association, Phoenix, Arizona; Alice O'Brien, Jason Walta, and Kristen Hollar, National Education Association, Washington, D.C., for Amici Curiae National Education Association and Arizona Education Association.

Charles Sipos, Nicholas Manheim, and David Perez, Perkins Coie LLP, Seattle, Washington, for Amici Curiae Chief Earl Warren Institute on Law and Social Policy and the Anti-Defamation League.

Brian Matsui, Jeremy Merkelson, Laura Heiman, and Betre Gizaw, Morrison & Foerster LLP, Washington, D.C., for Amici Curiae Rodolfo Acuña, Bill Bigelow, Richard Delgado, and Jean Stefancic.

Marie Quasius, Ben Hellerstein, Tia Sargent, Raina Wagner, and Theodore Angelis, K&L Gates LLP, Seattle, Washington; Steven Bender, Marc-Tizoc González, and Beth Lyon, Coral Gables, Florida, for Amicus Curiae Latina and Latino Critical Legal Theory, Inc.

Warrington Parker and Mary Kelly Persyn, Orrick, Herrington & Sutcliffe LLP, San Francisco, California, for Amici Curiae 48 Public School Teachers.

**OPINION**

RAKOFF, District Judge:

The children of the Tucson Unified School District
("TUSD"), a majority of whom are of Mexican or other
Hispanic descent, have a natural interest in knowing more
about their cultural heritage and that of their community—or
so the school board of Tucson decided, inaugurating a
Mexican American Studies ("MAS") program in the Tucson
public schools. Arizona state superintendents of education, in
the belief that MAS was being perverted into a program for
promoting ethnocentrism and reverse racism, successfully
sponsored and implemented legislation that did away with the
program. The issue this case presents is whether in so doing
they and their colleagues violated the constitutional rights of
TUSD students.

In 2010, the Arizona legislature passed H.B. 2281,
codified at Arizona Revised Statutes ("A.R.S.") §§ 15-111
and 15-112, which directly led to the elimination of the MAS
program. The statute prohibits a school district or charter
school from including in its program of instruction any
courses or classes that: (1) "Promote the overthrow of the
United States government," (2) "Promote resentment toward
a race or class of people," (3) "Are designed primarily for
pupils of a particular ethnic group," or (4) "Advocate ethnic
solidarity instead of the treatment of pupils as individuals."
A.R.S. § 15-112(A). If the state board of education or the
superintendent of public instruction determines that a school
district is in violation of the statute, the district has sixty days
to achieve compliance (*e.g.*, by eliminating the program),
failing which the state superintendent or state board may
direct the department of education to withhold ten percent of

the district's state funding. A.R.S. § 15-112(B). The parties do not dispute that the statute was enacted almost entirely with the MAS program in mind, and MAS was the first and only ethnic studies program that has been found to be in violation of § 15-112.

This case was originally filed on October 18, 2010 by ten teachers and the director of TUSD's MAS program. The complaint was later amended to add two TUSD students, Maya Arce and Korina Lopez, and their parents as next best friends. A third student, Nicolas Dominguez, and his mother as his next best friend intervened in the case. However, Nicolas Dominguez and Korina Lopez voluntarily dismissed their appeals after graduating from high school, and the teachers' and director's claims were dismissed for want of standing in an Order dated January 10, 2012 from which no appeal has been taken. Thus, the only remaining plaintiffs are student Maya Arce and her father and next best friend, Sean Arce. Defendants are the Superintendent of Public Instruction, Diane Douglas,[1] the Arizona State Board of Education, and members of the Board of Education.

Plaintiffs assert that § 15-112, as enacted and enforced against the MAS program, violates their constitutional rights under the First and Fourteenth Amendments. Relevant to this appeal are plaintiffs' Fourteenth Amendment equal protection claim, First Amendment overbreadth and "viewpoint discrimination" claims, and Fourteenth Amendment void-for-vagueness claim. After § 15-112 was enacted and this lawsuit was commenced, plaintiffs moved for partial summary

---

[1] Superintendent Diane Douglas succeeded former Superintendent John Huppenthal, and, accordingly, has been substituted as a defendant pursuant to Federal Rule of Appellate Procedure 43.

judgment in their favor on their First Amendment overbreadth
and Fourteenth Amendment vagueness claims, but did not
move for summary judgment on their equal protection or First
Amendment viewpoint discrimination claims. Defendants
cross-moved for summary judgment in their favor on all of
plaintiffs' First Amendment and vagueness claims.
Subsequently, after § 15-112 was enforced against TUSD and
TUSD eliminated the MAS program, plaintiffs filed their
second motion seeking a preliminary injunction and asserting
irreparable harm and a likelihood of success on their
overbreadth, vagueness, equal protection, and viewpoint
discrimination claims.

In a Memorandum Order dated March 8, 2013, the district
court granted plaintiffs' motion for summary judgment with
respect to § 15-112(A)(3) on First Amendment overbreadth
grounds, but denied the motion with respect to all other
claims on which plaintiffs had sought summary judgment.
The court granted defendants' summary judgment motion
with respect to all of plaintiffs' remaining First Amendment
claims. It denied plaintiffs' motion for a preliminary
injunction. Finally, it *sua sponte* granted summary judgment
for defendants on plaintiffs' equal protection claim. The net
of all this was to allow final judgment to be entered,
dismissing all of plaintiffs' attacks on the statute and its
application, except for plaintiffs' claim that § 15-112(A)(3)
was unconstitutionally overbroad. Since, moreover, the
district court determined that that section was severable from
the other sections, the final judgment invalidated only § 15-
112(A)(3).

Plaintiffs now appeal the district court's decision with
respect to their equal protection claim, their First Amendment
overbreadth claim with respect to §§ 15-112(A)(2) and

(A)(4), their First Amendment viewpoint discrimination claim, and their Fourteenth Amendment vagueness claim. Defendants cross-appeal the district court's decision that § 15-112(A)(3) is overbroad in violation of the First Amendment. We affirm the district court's decision in part, reverse in part, and remand for further proceedings in accordance with this opinion.

*Facts*

The pertinent facts are as follows. As of April 20, 2011, sixty percent of the children enrolled in the Tucson public schools were of Mexican or other Hispanic descent. The MAS program was developed in 1998 and later expanded under a federally enforced desegregation decree. *See Fisher v. Tucson Unified Sch. Dist.*, 652 F.3d 1131, 1134 (9th Cir. 2011). The program sought to provide a culturally relevant curriculum for students from kindergarten to 12th grade by incorporating historical and contemporary Mexican American contributions into coursework and classroom studies.

Efforts to disband the MAS program began in 2007, after a group of students walked out of a speech by the Deputy Superintendent of Public Education, Margaret Garcia Dugan. Ms. Dugan was giving a speech that was intended to refute a prior allegation made to the student body that "Republicans hate Latinos." In an open letter to the City of Tucson following the speech, the then Superintendent of Public Instruction, Tom Horne, asserted that "the students did not learn this rudeness at home, but from their Raza teachers."[2]

---

[2] The MAS program was previously called "Mexican American/Raza Studies." Plaintiffs assert that "La Raza" more generally refers to Mexican Americans. *See* American Heritage Dictionary of the English Language,

In the letter, he advocated the elimination of ethnic studies programs, specifically MAS. When this informal effort failed, he became a force behind the enactment of A.R.S. § 15-112.

The formal bill, H.B. 2281, 49th Leg., 2d Sess. (Ariz. 2010), passed the state legislature, and on May 11, 2010, Governor Jan Brewer signed it into law with an effective date of December 31, 2010. Relevant aspects of the legislative history are summarized below in the analysis of plaintiffs' equal protection claim.

Following the enactment of 15-112, Horne successfully campaigned to become Arizona Attorney General. On December 30, 2010, his last day in office as the superintendent of public instruction and the day before the statute took effect, Horne prematurely issued a finding that TUSD was in violation of A.R.S. § 15-112 because of its MAS program, and gave TUSD sixty days to "eliminate the Mexican American Studies courses." The finding noted that three ethnic studies courses "could be found in violation," but that he had received complaints only about the MAS program.

John Huppenthal succeeded Horne as the superintendent of public instruction immediately after serving as an Arizona state senator. On January 4, 2011—four days after taking office as superintendent—he issued a press release supporting Horne's finding. *See* Arizona Department of Education, Superintendent of Public Instruction John Huppenthal's

---

*available at* http://ahdictionary.com/word/search.html?q=la+raza& submit.x=0&submit.y=0 (last visited June 9, 2015) (defining "La Raza" as "Mexicans or Mexican Americans considered as a group, sometimes extending to all Spanish-speaking people of the Americas").

Official Statement on TUSD Violation of A.R.S. § 15-112 (Jan. 4, 2011), *available at* http://www.azed.gov/public-relations/files/2011/08/pr01-04-11.pdf (last visited June 9, 2015).[3] However, he chose not to enforce the finding immediately but conducted his own investigation of the program by retaining an independent auditor, Cambium Learning, Inc.

On May 2, 2011, Cambium, after visiting classes, conducting focus groups, and reviewing curriculum materials, issued a report (the "Cambium Report") that found that "no observable evidence was present to indicate that any classroom within [TUSD] is in direct violation of the law, A.R.S. 15-112(A). In most cases, quite the opposite is true." Huppenthal rejected the Cambium Report's findings and directed the Arizona Department of Education ("ADE") to make a separate investigation of the program. On the basis of that second investigation, Huppenthal found the MAS program in violation of A.R.S. §§ 15-112(A)(2), (A)(3), and (A)(4). TUSD appealed the decision, and an administrative law judge affirmed Huppenthal's finding of violation. On January 16, 2012, Huppenthal accepted the ALJ's decision and withheld ten percent of TUSD's funds, retroactive to the expiration of 60 days from his initial finding of violation. Further, he required TUSD to remove all MAS instructional materials from K-12 classrooms by February 29, 2012. Faced with these sanctions, TUSD terminated the MAS program on January 10, 2012.

---

[3] We take judicial notice of the press release, because it is a public record on file with the Arizona State Board of Education. *See* Fed. R. Evid. 201(b); *Lee v. City of Los Angeles*, 250 F.3d 668, 688–89 (9th Cir. 2001).

*Discussion*

This Court reviews *de novo* a district court's grant or denial of summary judgment. *Blue Lake Rancheria v. United States*, 653 F.3d 1112, 1115 (9th Cir. 2011); *Arakaki v. Hawaii*, 314 F.3d 1091, 1094 (9th Cir. 2002). Summary judgment is appropriate where "the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(a). In reviewing a grant of summary judgment, the Court views "the evidence and inferences therefrom in the light most favorable to the party against whom the district court ruled." *Allen v. A.H. Robins Co., Inc.*, 752 F.2d 1365, 1368 (9th Cir. 1985). A district court's decision to grant summary judgment *sua sponte* is reviewed for abuse of discretion. *See Corales v. Bennett*, 567 F.3d 554, 570 (9th Cir. 2009).

We begin our discussion with plaintiffs' claim that the enactment and closely linked enforcement of § 15-112 denied them equal protection of the law, in violation of the Fourteenth Amendment. In its Memorandum Order dated March 8, 2013, the district court, *sua sponte*, granted summary judgment for defendants dismissing this claim. While it is within the power of a district court to grant summary judgment *sua sponte*, *see Norse v. City of Santa Cruz*, 629 F.3d 966, 971 (9th Cir. 2010), the court must first give the parties notice and time to respond, unless the party against which summary judgment is granted has already had a "full and fair opportunity to ventilate the issues," *United States v. Grayson*, 879 F.2d 620, 625 (9th Cir. 1989); *Albino v. Baca*, 747 F.3d 1162, 1176 (9th Cir. 2014).

Here, the district court did not give prior notice to the parties, but found that "the merits of [this claim had] been

fully and fairly vetted in connection with Plaintiffs' second motion for preliminary injunction." *Acosta v. Huppenthal*, No. CV 10-623-TUC-AWT, 2013 WL 871892, at *3 (D. Ariz. Mar. 8, 2013). We have held, however, that despite the court's power to grant summary judgment *sua sponte*, it is generally inappropriate for a court to issue such a final judgment on the merits of a claim at the preliminary injunction stage, because it is unlikely that the merits of a claim will be fully ventilated at the early stage of a litigation at which a preliminary injunction is normally addressed. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). We see no exception here. A party is not required to prove her case in full on preliminary injunction, but only such portions as will enable her to obtain the injunction. Here, the district court, by not offering plaintiffs notice of its intent to convert the preliminary injunction motion into basis for grant of summary judgment, deprived plaintiffs of the opportunity to submit additional evidence and argument on the merits of their equal protection claim.

That decision was not harmless, given the evidence plaintiffs now represent they would have presented on summary judgment had they been given opportunity. Indeed, this evidence is in many respects relevant to our analysis of the merits of the equal protection claim, *infra*, where we conclude that there is a genuine issue of fact as to whether the statute was enacted and/or enforced with discriminatory intent. For example, plaintiffs refer us to legislative hearings and administrative documents (discussed below) that are relevant to a discriminatory intent analysis. Furthermore, plaintiffs assert that, if given the opportunity, they would have presented emails of legislators evincing discriminatory intent and information regarding the historical background surrounding the passage of H.B. 2281, as well as additional

evidence with respect to Huppenthal's rejection of the Cambium Report and complaints that the state had received about other ethnic studies programs that made them indistinguishable from MAS. Accordingly, we find that the district court abused its discretion in *sua sponte* granting summary judgment for defendants on plaintiffs' equal protection claim.

That said, in light of the evidence presented in the record and on appeal, we see no reason to remand the equal protection claim for additional briefing on summary judgment, because, even on the record before us, we find that there are genuine issues of fact regarding whether the enactment and/or enforcement of § 15-112 was motivated at least in part by a discriminatory intent. We therefore reverse the district court's grant of summary judgment for defendants and remand the equal protection claim for trial.

We reach this conclusion even though we agree with the district court that the statute is not discriminatory on its face. Plaintiffs argue that § 15-112 is facially discriminatory because the legislative history shows that the use of the term "ethnic" in § 15-112(A)(3) and (A)(4) refers specifically to ethnic minorities. *See* A.R.S. §§ 15-112(A)(3) (prohibiting classes "designed primarily for pupils of a particular ethnic group"), (A)(4) (prohibiting classes that "advocate ethnic solidarity"). However, a review of legislative history is only appropriate in a facial analysis where the application of the plain meaning of a word is ambiguous or otherwise leads to absurd or futile results. *See United States v. Am. Trucking Assocs.*, 310 U.S. 534, 543 (1940); *Milne ex rel. Coyne v. Stephen Slesinger, Inc.*, 430 F.3d 1036, 1045 (9th Cir. 2005). Here, the Merriam-Webster Dictionary defines "ethnic" as "of or relating to large groups of people classed according

to common racial, national, tribal, religious, linguistic, or cultural origin or background." Merriam-Webster Online Dictionary, http://www.merriam-webster.com/dictionary/ethnic (last visited May 5, 2015). Given the declaration of policy in A.R.S. § 15-111 ("The legislature finds and declares that public school pupils should be taught to treat and value each other as individuals and not to be taught to resent or hate other races or classes of people."), the plain meaning of "ethnic" in this context is not ambiguous, nor does it lead to an absurd result. On its face, the statute implicates all ethnic backgrounds, not only ethnic minorities. Accordingly, a review of the legislative history is inappropriate here, and we do not find the statute to be discriminatory on its face.

Even if § 15-112 is not facially discriminatory, however, the statute and/or its subsequent enforcement against the MAS program would still be unconstitutional if its enactment or the manner in which it was enforced were motivated by a discriminatory purpose. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1997). A plaintiff does not have to prove that the discriminatory purpose was the sole purpose of the challenged action, but only that it was a "motivating factor." *Id.* at 266. The Supreme Court articulated the following, non-exhaustive factors that a court should consider in assessing whether a defendant acted with discriminatory purpose: (1) the impact of the official action and whether it bears more heavily on one race than another; (2) the historical background of the decision; (3) the specific sequence of events leading to the challenged action; (4) the defendant's departures from normal procedures or substantive conclusions; and (5) the relevant legislative or administrative history. *Id.* at 266–68; *Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1158–59 (9th Cir. 2013).

Moreover, when relying on *Arlington Heights* to demonstrate that an action was motivated by a discriminatory purpose, a plaintiff need provide "very little such evidence to raise a genuine issue of fact; any indication of discriminatory motive may suffice to raise a question that can only be resolved by a fact-finder." *Pac. Shores Props.*, 730 F.3d at 1159 (quoting *Schindrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1409 (9th Cir. 1996)) (internal alternations omitted). Here, while the action ultimately complained of is the forced elimination of the MAS program pursuant to § 15-112, plaintiffs assert that this was the very purpose of the enactment of the statute, with some of the key players involved at every stage. When the history of the enactment and its subsequent application are viewed together, plaintiffs further assert, there is at least a genuine issue of material fact as to whether the statute was enacted and enforced with discriminatory intent. Applying the *Arlington Heights* factors, we agree.

With respect to the first *Arlington Heights* factor—the impact of the official action and whether that bears more heavily on one race than another—it is undisputed that the statute's enactment and enforcement has had a disparate impact on Mexican American students, such as plaintiff Maya Arce. Not only were sixty percent of all TUSD students of Mexican or other Hispanic descent, but also ninety percent of students in the MAS program were such. Moreover, defendants concede that the statute was enacted in response to complaints about the MAS program and that the statute has been enforced only against the MAS program, even though two other ethnic studies programs in Arizona were alleged by the state superintendent to seemingly violate § 15-112. Accordingly, the enactment and enforcement of § 15-112 has had a disproportionate impact on Mexican American and other Hispanic students.

It is true, to jump ahead to the fifth *Arlington Heights* factor—the relevant legislative or administrative history— that the legislative history contains only a few snippets of overtly discriminatory expression. However, given that "officials acting in their official capacities seldom, if ever, announce on the record that they are pursuing a particular course of action because of their desire to discriminate against a racial minority," we look to whether they have "camouflaged" their intent. *Smith v. Town of Clarkton*, 682 F.2d 1055, 1064, 1066 (4th Cir. 1982). Here, the legislative history of § 15-112 and the sequence of events (including the administrative history) leading to its enactment reasonably suggest an intent to discriminate.

During hearings regarding H.B. 2281, which was later codified as § 15-112, the MAS program was the sole target of the legislative effort. When introducing H.B. 2281 before the House Education Committee, Representative Steve Montenegro characterized MAS as creating "racial warfare." *Hearing on H.B. 2281, H. Comm. on Educ.* ("H.B. 2281 House Educ. Comm. Hearing"), 49th Leg., 2d Sess., at 1:16:35 (2010) (statement of Rep. Montenegro), *available at* http://azleg.granicus.com/MediaPlayer.php?view_id=17&clip_id=6760 (last visited June 9, 2015).[4] Former Superintendent Horne, when testifying at both that hearing and before the Senate Committee on Education Accountability and Reform, began his remarks by recounting the incident from 2007 where students walked out of the speech given by his deputy. H.B. 2281 House Educ. Comm.

---

[4] We take judicial notice of legislative history materials pursuant to Federal Rules of Evidence Rule 201(b). *See Aramark Facility Servs. v. SEIU, Local 1877*, 530 F.3d 817, 826 n.4 (9th Cir. 2008); *Zephyr v. Saxon Mortg. Servs. Inc.*, 873 F. Supp. 2d 1223, 1226 (E.D. Ca. 2012).

Hearing at 1:25:48; *Hearing on H.B. 2281, S. Comm. on Educ. Accountability and Reform* ("H.B. 2281 S. Comm. Educ. Accountability and Reform Hearing"), 49th Leg., 2d Sess., at 2:46:25 (2010) (statement of Superintendent Horne), *available at* http://azleg.granicus.com/MediaPlayer.php? view_id=17&clip_id=7405 (last visited June 9, 2015). He stated that the MAS program "promoted" the group MeCHA, which he characterized as a group "that among other things says that North America is a land for the bronze peoples." H.B. 2281 House Educ. Comm. Hearing at 1:34:39. He added that he saw a TUSD high school librarian who was "wearing a MeCHA t-shirt." *Id.*

Such statements, especially when coupled with the administrative history (discussed below) that immediately preceded enactment, raise at least a plausible inference that racial animus underlay passage of the legislation.[5] Consideration of the administrative history also impacts

---

[5] Plaintiffs state that if they had been given the opportunity to brief the equal protection claims under a summary judgment analysis, they would have introduced emails from legislators evincing animus against Mexican Americans while advocating for this legislation. Though such material would likely be highly relevant to the *Arlington Heights* analysis, *Vill. of Arlington Heights*, 429 U.S. at 268, that material is not before us. Plaintiffs also assert that they would have provided the district court with evidence of the historical background of § 15-112, specifically with regard to the relationship between the State's anti-immigration efforts and the passage of this statute. They assert that this law and the controversial anti-immigration law, S.B. 1070, moved through the Arizona legislature at the same time and were passed in a climate charged with animus against Mexicans and Mexican Americans. Again, while all this reinforces our determination that the district court erroneously granted summary judgment *sua sponte* on this claim, we do not consider it in our further conclusion that summary judgment on this claim was, in any case, wrongly granted to defendants.

evaluation of the second, third, and fourth *Arlington Heights* factors (the historical background of the decision, the specific sequence of events leading to the challenged action, and the defendants' departures from normal procedures or substantive conclusions). Indeed, the legislative and administrative history are closely intertwined.

At the time H.B. 2281 moved through the legislature, future Superintendent Huppenthal was a state senator and the Chairman of the Senate Committee on Education Accountability and Reform. *See* H.B. 2281 S. Comm. Educ. Accountability and Reform Hearing. About one month before Governor Brewer signed H.B. 2281 into law, Huppenthal introduced an amendment to the bill that granted authority to the state superintendent to determine whether a school district was in violation of the statute, an amendment which was adopted by the Senate and incorporated in § 15-112. *See* Senate Amendments to H.B. 2281, 49th Leg., 2d Sess. (Ariz. 2010), *available at* http://www.azleg.gov// FormatDocument.asp?inDoc=/legtext/49leg/2r/adopted/s.2 281ed.doc.htm&Session_ID=93 (last visited June 9, 2015); Floor Amendment Explanation, H.B. 2281, 49th Leg., 2d Sess. (Ariz. 2010), *available at* http://www.azleg.gov// FormatDocument.asp?inDoc=/legtext/49leg/2r/adopted/228 1huppenthal808.doc.htm&Session_ID=93 (last visited June 9, 2015); *see also* H.B. 2281 S. Comm. Educ. Accountability and Reform Hearing at 2:50:38. Then, prior to H.B. 2281's effective date, Huppenthal successfully ran to become state superintendent of public instruction; in the process he aired radio campaign advertisements where he pledged to "stop La Raza" if elected. He was subsequently elected and took office immediately after the statute went into effect.

At the same time as Huppenthal ran for superintendent, former Superintendent Horne ran for the office of Arizona Attorney General. On his attorney general election website, he stated in a video, "I fought hard to get the legislature to put a—to pass a law so that I can put a stop to [the Raza Studies program]. And as the attorney general, I will give the legal aid to the Department of Education to be sure that we do put a stop to it."

On December 30, 2010, the day before § 15-112 went into effect and just before Horne ceded his position of state superintendent to Huppenthal, Horne issued a (premature) "Finding" that TUSD was in violation of the not-yet-effective § 15-112 and directed TUSD to "eliminate the Mexican American Studies courses" within sixty days or risk having ten percent of its budget withheld. As the district court found, "[t]he timing of the Finding underscores Horne's determination to do away with the MAS program, and it also means that Horne necessarily applied the statute retroactively, without any effort to show that the problematic materials were in use at the time of the Finding." *Acosta*, 2013 WL 871892, at *14.

Upon assuming office as superintendent on January 4, 2011, Huppenthal immediately issued a press release supporting Horne's finding and stating that TUSD had the responsibility "to ensure their programs come into full compliance with A.R.S. § 15-112 within 60 days of Superintendent Horne's official finding." Nonetheless, Huppenthal did not immediately enforce Horne's finding, but instead commissioned Cambium Learning to audit the MAS program and determine whether the program was in compliance with § 15-112. Cambium audited MAS courses over a period of two months by visiting classrooms,

reviewing course materials, and holding focus group interviews with various stakeholders. The auditors visited 39.5% of high school MAS courses and spent about thirty minutes in each class. In May 2011, Cambium released its report, which found that there was no evidence that MAS was in violation of § 15-112. The auditors did not observe any evidence that MAS courses promoted resentment towards a race or class of people, nor that they were necessarily designed for pupils of a particular ethnic group, as all students were welcomed into the program.

Nevertheless, in one of the most telling actions in this entire saga, Huppenthal then rejected the conclusions of the Cambium study that he himself had commissioned, concluding that, because the MAS department was aware of the audit, "naturally the auditors are never going to observe [the promotion of racism or ethnic solidarity]." He ordered a new, separate ADE investigation, which reviewed only a selection of course materials and the MAS program website. There are conflicting statements in the record as to whether ADE officials even visited classrooms as part of the investigation. Yet, following ADE's investigation, Huppenthal found the MAS program in violation of A.R.S. §§ 15-112(A)(2), (A)(3), and (A)(4).

In reviewing Huppenthal's finding of violation in the context of plaintiffs' equal protection claim, the district court held that deficiencies in the Cambium Report, such as a limited number of classroom observations and a supposed failure to obtain comprehensive information from the MAS department, gave Huppenthal a reasonable basis to disregard the Cambium Report. But these were not the grounds Huppenthal himself gave for rejecting the Report and there was certainly sufficient evidence for a reasonable fact-finder

to infer otherwise. Whether the motivation behind Huppenthal's rejection of the Report was based on its alleged deficiencies, or whether it was based on a predetermined intent to find the MAS program in violation of § 15-112, is a question for the fact-finder to decide.

In short, applying the five *Arlington Heights* factors to the evidence of record—taken, as it must be for these purposes, most favorably to plaintiffs—there is sufficient evidence to raise a genuine issue of material fact as to whether the enactment and/or enforcement of § 15-112 here challenged was motivated, at least in part, by an intent to discriminate against MAS students on the basis of their race or national origin.[6] Accordingly, we reverse the district court's grant of summary judgment for defendants on the equal protection claim and remand it to the district court for trial.[7]

---

[6] Plaintiffs advance the separate argument that § 15-112 should be struck down because its enactment and enforcement was motivated by a desire to disadvantage a specific, politically unpopular group—the students, teachers, and parents who supported the MAS program. Though the district court did not rule on this particular issue, we find no evidence to support plaintiffs' assertion that its enactment or enforcement independently targeted supporters of the MAS program without regard to their race or national origin.

[7] Plaintiffs also present an alternative basis for their equal protection claim by invoking what are known as the "political structure" equal protection cases, *Hunter v. Erickson*, 393 U.S. 385 (1969), and *Washington v. Seattle School District No. 1*, 458 U.S. 457 (1982). *See Coal. for Econ. Equity v. Wilson*, 122 F.3d 692, 704 (9th Cir. 1997). In *Hunter* and *Washington*, the Supreme Court struck down legislation that placed "special burdens" on racial minorities within the governmental process, making it more difficult for racial minorities "to achieve legislation that is in their interest." *Seattle*, 458 U.S. at 470 (quoting *Hunter*, 393 U.S. at 391, 395). We agree with the district court that these cases do not apply here, as the laws at issue in *Hunter* and *Seattle* "dealt

We now turn to plaintiffs' claims under the First Amendment. As a general matter, plaintiffs assert that their First Amendment rights are implicated because the enforcement of § 15-112 impedes TUSD students' right to receive information and ideas. *See Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 866–67 (1982) (plurality opinion). In *Pico*, a plurality of the Supreme Court recognized that "the right to receive ideas is a necessary predicate to the *recipient's* meaningful exercise of his own rights of speech, press, and political freedom," and held, accordingly, that a school could not remove certain materials from its library because of a disagreement with the ideas in the book or to impose upon the students a "political orthodoxy." *Pico*, 457 U.S at 867, 875. In *Montiero v. Tempe Union High School District*, 158 F.3d 1022 (9th Cir. 1998), we found that this right extended to students' right to receive information in the context of the development of a school curriculum. *Id.* at 1027 n.5. However, *Montiero* involved the extent to which a third-party—a parent or group of parents— could attempt to limit the materials that a school furnishes to students and requires them to read. *Id.* at 1027–28. We were

---

with political obstructions placed in the way of minorities seeking to remedy identified patterns of racial discrimination." *Valencia v. Davis*, 307 F.3d 1036, 1040 (9th Cir. 2002). Here, while the MAS program was expanded and incorporated into Tucson's Post Unitary Status Plan ("PUSP") that is part of an ongoing federally enforced desegregation decree, *see Fisher*, 652 F.3d at 1134, we cannot say that the program was designed to remedy past discrimination, as the program was initially developed in 1998, over ten years before the PUSP was set in place. Furthermore, we do not find that § 15-112 set in place substantial political obstacles for minorities to remedy past discrimination. The statute places limitations on school curricula without substantially interfering with plaintiffs' ability to seek relief through the PUSP or through the state and local government initiatives. Accordingly, we find that the equal protection claim rests solely on an *Arlington Heights* theory.

not faced with the issue presented here, which involves the extent to which a state superintendent can decide on the basis of his own evaluation to remove from a student's purview certain material otherwise approved by the local school board. *See id.* at 1029.

Defendants argue that we should apply our holding in *Downs v. L.A. Unified School District*, 228 F.3d 1003 (9th Cir. 2000), and the Fifth Circuit's holding in *Chiras v. Miller*, 432 F.3d 606 (5th Cir. 2005), both of which restricted speech in a school setting because the schools' actions were considered government speech and were therefore immune from a forum or viewpoint-discrimination analysis. *See Downs*, 228 F.3d at 1016–17; *Chiras*, 432 F.3d at 612–17. However, neither of these holdings involved a *student's* First Amendment rights, and are accordingly inapplicable to the instant case. In *Downs*, we held that material that a *teacher* posted on a school bulletin board was government speech, and therefore the teacher had no First Amendment right to challenge regulation of that material. *Downs*, 228 F.3d at 1005, 1011. In *Chiras*, the Fifth Circuit applied a government speech analysis to an *author's* claim that the state's rejection of his textbook for inclusion in the classroom violated his First Amendment rights. *Chiras*, 432 F.3d at 607, 618. In that context, *Chiras* held that the selection of textbooks and development of curriculum was government speech and did not create a public forum in which the author could assert a First Amendment right. *Id.* at 618. However, the court engaged in an entirely separate analysis (discussed below) with regard to the other plaintiff, a high school student. *Id.* at 618 ("The conclusion that no forum exists in this case does not necessarily preclude" the student's First Amendment claim.). Accordingly, we find that the holdings in *Downs* and

*Chiras*, at least with respect to their government speech analyses, are distinguishable from the instant case.

Therefore, we are tasked with determining the appropriate level of scrutiny that applies to a state's decision to restrict classroom materials presented as part of a curriculum approved by a local school board in light of a student's right to receive information and ideas. This analysis necessarily implicates the delicate balance between a student's First Amendment rights and a state's authority in educational matters. *See Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988); *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 681 (1986); *Pico*, 457 U.S at 866. Students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," and, yet, these rights must be applied "in light of the special characteristics of the school environment." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969).

At least four other circuits have grappled with the breadth of a student's First Amendment rights in the context of the development of a school curriculum, and they have developed tests granting varying levels of leniency to the government. For example, the Eleventh and Eighth Circuits have developed tests that require schools to provide legitimate reasons for limiting students' access to information. In *Virgil v. School Board of Columbia County*, 862 F.2d 1517, 1522 (11th Cir. 1989), the Eleventh Circuit applied the standard set forth by the Supreme Court in *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260. In *Kuhlmeier*, the Court held that a school could exercise editorial control over a student newspaper, which was found to be part of the curriculum, 484 U.S. at 271, "so long as [the educators'] actions are reasonably related to legitimate pedagogical concerns," *id.* at

273. In *Pratt v. Indiana School District No. 831*, 670 F.2d 771 (8th Cir. 1982), the Eighth Circuit held that "the [school] board must establish that a substantial and reasonable governmental interest exists for interfering with the students' right to receive information." *Id.* at 777. There, the court found that a school board could not remove a controversial film from its curriculum because a majority of its members objected to the film's religious and ideological content. *Id.* at 773.

The Seventh and Fifth Circuits give the government greater scope in curtailing school curricula. In *Zykan v. Warsaw Community School Corporation*, 631 F.2d 1300 (7th Cir. 1980), the Seventh Circuit found that "nothing in the Constitution permits the courts to interfere with local educational discretion until local authorities begin to substitute rigid and exclusive indoctrination for the mere exercise of their prerogative to make pedagogic choices regarding matters of legitimate dispute." *Id.* at 1306. The Fifth Circuit in *Chiras* limited a student's right to receive information to materials available in the school library, but stated *arguendo* that if the decision in *Pico* did apply in the context of curricular decisionmaking, the state's discretion was limited only if motivated by "narrowly partisan or political" considerations. 432 F.3d at 619–20 (quoting *Pico*, 457 U.S. at 870–71).

Here, the district court followed the Eleventh Circuit's decision in *Virgil*, 862 F.2d 1517, and applied the Supreme Court's *Kuhlmeier* test to plaintiffs' First Amendment claims. Though the facts in *Kuhlmeier* are somewhat distinct from this case in that it involved students' right to speak as opposed to right to receive, we agree with the district court that *Kuhlmeier*'s reasoning can be read to establish that state

limitations on school curricula that restrict a student's access to materials otherwise available may be upheld only where they are reasonably related to legitimate pedagogical concerns—especially in a context such as this, where the local school board has already determined that the material at issue adds value to its local school curriculum. Granting wider discretion has the potential to substantially hinder a student's ability to develop the individualized insight and experience needed to meaningfully exercise her rights of speech, press, and political freedom. *Pico*, 457 U.S. at 867. Accordingly, we adopt the standard employed by the district court and hold that the state may not remove materials otherwise available in a local classroom unless its actions are reasonably related to legitimate pedagogical concerns. *Kuhlmeier*, 484 U.S. at 273.[8]

---

[8] Defendants argue, seemingly for the first time on appeal, that they are not responsible for the elimination of the MAS curriculum and its materials, but rather that TUSD is. Therefore, they assert, they should not be liable for curricular decisions of the school district that may have infringed on plaintiffs' First Amendment rights. This characterization of the circumstances surrounding the removal of material is artificial and ignores completely the fact that former Superintendent Huppenthal directly caused, indeed ordered, TUSD to remove MAS-related books from its curriculum as part of his finding TUSD was not in compliance with § 15-112. Specifically, the State not only imposed a fine of ten percent of state funding until TUSD came into compliance, but also required proof that all MAS instructional material had been removed from TUSD classrooms. Former Superintendent Huppenthal was personally responsible for monitoring compliance with this demand. Therefore, even if defendants had not waived their argument by failing to raise it below, we find there is no genuine dispute that the defendants are responsible for the elimination of the program and removal of material from the classroom and are accordingly subject to plaintiffs' First Amendment claims.

Having established the relevant scope of a student's First Amendment right in this context, we turn to plaintiffs' two specific claims that that right is infringed by § 15-112, to wit, that the statute is overbroad and that it imparts viewpoint discrimination. Turning first to overbreadth, a law may be invalidated under the First Amendment overbreadth doctrine if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6 (2008)); *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 944 (9th Cir. 2011). The doctrine exists out of concern that the threat of enforcement of an overbroad law may chill constitutionally protected speech. *Comite de Jornaleros*, 657 F.3d at 944.

The first step in an overbreadth analysis is to construe the statute, as "it is impossible to determine whether a statute reaches too far without first knowing what the statute covers." *Id.* at 945 (quoting *United States v. Williams*, 553 U.S. 285, 293 (2008)). Using Arizona's own rules of statutory construction of its statutes, we look to the statute as a whole, and, where the language of the statute is clear and unambiguous, we will not look beyond that language but will assume the legislature means what it says. *Arizona Dep't of Revenue v. Action Marine, Inc.*, 181 P.3d 188, 190 (Ariz. 2008); *TDB Tucson Grp., L.L.C. v. City of Tucson*, 263 P.3d 669, 672 (Ariz. Ct. App. 2011).[9]

---

[9] Federal rules of statutory construction are the same in these respects as Arizona's. *See Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000); *Avendano-Ramirez v. Ashcroft*, 365 F.3d 813, 818 (9th Cir. 2004).

The district court found that the primary legitimate purpose of the statute, on its face, is to prohibit courses that "promote racism," and the like, a holding which neither party challenges on appeal. *Cf.* A.R.S. § 15-111 ("The legislature finds and declares that public school pupils should be taught to treat and value each other as individuals and not be taught to resent or hate other races or classes of people."). Applying the *Kuhlmeier* standard discussed above, the district court assessed whether the statutory provisions of § 15-112 are reasonably related to the legitimate pedagogical interest of reducing racism in schools. Plaintiffs appeal the district court's decision upholding § 15-112(A) generally, and § 15-112(A)(2) and (A)(4), specifically, under a First Amendment overbreadth analysis. Defendants, in their cross-appeal, challenge the district court's determination that § 15-112(A)(3) is overbroad.

Section 15-112(A) begins: "A school district or charter school in this state shall not include in its program of instruction any courses or classes that include any of the following: [the four enumerated prohibitions]." Plaintiffs now argue that the phrases "any courses or classes" and "include any" are overbroad, because they result in onerous penalties on the school district if prohibited content is found in even one course or class. While we are skeptical that this is a reasonable reading of the statute as a whole given its provision of a 60-day "cure" period that could easily deal with an isolated violation, we need not reach the issue, for it was not fairly raised below. Indeed, the district court, in its detailed opinion, did not expressly make a finding with regards to § 15-112(A) generally. We find nothing in plaintiffs' occasionally broad rhetoric below that fairly put either the district court or defendants on notice that the entire statute, either on its face or as applied, was being challenged

as a whole on First Amendment overbreadth grounds. Accordingly, the issue is not properly before us here.

But there is no question that plaintiffs did challenge subsections (A)(2), (A)(3), and (A)(4) on overbreadth grounds, so we consider each in turn. Section 15-112(A)(2) prohibits any courses or classes that "[p]romote resentment toward a race or class of people." Plaintiffs' challenge to this provision stems from a fear that the statute will be used to target courses or classes that incidentally promote resentment towards a race or class of people, even though the course was not designed for that purpose but seeks to impart to students a range of historical and cultural perspectives. For example, they are concerned that a discussion in an English class of Mark Twain's *The Adventures of Huckleberry Finn* or Richard Wright's *Black Boy* might inadvertently bring about feelings of resentment in some students and prompt a finding of violation.

However, we agree with the district court that the provision on its face is not overbroad in violation of the First Amendment, because the statute targets the design and implementation of courses and curricula and does not restrict individual student speech or class discussions.[10] As the district court found: "[T]he word 'promote' takes on a more intentional and active meaning in this context. In this way, a given class *discussion* could incidentally promote resentment, but to say that a course designed to teach about the oppression of Mexican–Americans is automatically a class

---

[10] We would share plaintiffs' concerns in the event the statute were used to censor materials that individually, and incidentally, could cause feelings of resentment but that are placed within the context of an entire course or curriculum in a manner that creates an unbiased presentation of material.

that 'promotes resentment toward a race' would stretch the plain meaning of 'promote' too far." *Acosta*, 2013 WL 871892, at \*9.

The exceptions to the statute also support the district court's finding that the statute targets the design of courses and not individual feelings or class discussions, because the exceptions provide additional limitations on the statute's reach. Section 15-112(F) states that "[n]othing in this section *shall be construed* to restrict or prohibit the instruction of the holocaust, any other instance of genocide, or the historical oppression of a particular group of people based on ethnicity, race, or class." A.R.S. § 15-112(F) (emphasis added). This instructs the state and the school districts that the statute should not be construed in a manner that would prohibit the objective instruction of historical oppression, regardless of whether that instruction incidentally promotes resentment towards a race or class of people. It would be inappropriate for us to read the statute more broadly to find that this provision unconstitutionally prohibits courses that unintentionally promote resentment, as the provision is readily susceptible to the more narrow construction we have identified. *See Stevens*, 559 U.S. at 481. Accordingly, we affirm the district court's holding that § 15-112(A)(2) is not overbroad in violation of the First Amendment, because we cannot conclude that a substantial number of its applications would not be reasonably related to the state's legitimate pedagogical interest in reducing racism.

Skipping ahead to subsection (A)(4), the district court held that § 15-112(A)(4), which prohibits courses and classes that "[a]dvocate ethnic solidarity instead of the treatment of pupils as individuals," is not overbroad in violation of the First Amendment. Again, we agree. Plaintiffs assert that there

is nothing inherently racist about "advocating ethnic solidarity," and, therefore, the statute proscribes instruction that is not related to the state's objective in reducing racism. However, we find that the statute, as written, does not broadly prohibit courses that advocate ethnic solidarity, but only courses that advocate ethnic solidarity *instead of* treating students as individuals, in effect another form of racism. The latter half of the provision sufficiently limits the statute within constitutional bounds. For example, a course that advocates ethnic solidarity *and* treats students as individuals would not violate the statute. Accordingly, we hold that, when reading the provision in its entirety and construing it in light of the whole statute, § 15-112(A)(4) is reasonably related to the state's legitimate pedagogical interest in reducing racism, and affirm the district court's decision that it is not overbroad in violation of the First Amendment.

The only provision the district court found to be constitutionally overbroad in the sense we have been discussing is § 15-112(A)(3), which prohibits courses and classes that "[a]re designed primarily for pupils of a particular ethnic group." The court found that any legitimate purpose this provision could serve is already encompassed by subsections (A)(2) and (A)(4). If a course designed primarily for pupils of a particular ethnic group *does not* promote resentment towards other races or classes of people and *does not* advocate ethnic solidarity instead of treating pupils as individuals, the court questioned whether any legitimate purpose could be served by forbidding such classes. We agree. The very danger we perceive was corroborated, at oral argument, when we asked counsel for defendants whether the statute could be found to prohibit a public school course in San Francisco on the topic of Chinese history that was open to all students but was designed in consideration of the

substantial Chinese and Chinese American student population there that might benefit from a greater understanding of its history. Defendants asserted that the course could be found in violation. As indicated by this example, subsection (A)(3) threatens to chill the teaching of ethnic studies courses that may offer great value to students— yet it does so without furthering the legitimate pedagogical purpose of reducing racism. We therefore affirm the district court's holding that (A)(3) is overbroad in violation of the First Amendment.

Turning next to plaintiffs' other First Amendment challenge to § 15-112—namely, that it imposes viewpoint discrimination—plaintiffs again complain that the district court prematurely entered summary judgment against them on this claim. Plaintiffs raised a First Amendment viewpoint discrimination argument in their second motion for preliminary injunction, but only moved for summary judgment on their First Amendment overbreadth claim. Nevertheless, the district court granted summary judgment for defendants on all of plaintiffs' First Amendment claims, even though the viewpoint discrimination claim had not been briefed by either of the parties in their cross-motions for summary judgment. Moreover, in contrast to its *sua sponte* grant of summary judgment discussing plaintiffs' equal protection claim, here the order of the district court did not even review the evidence with respect to the viewpoint discrimination claim. Accordingly, we remand that claim to the district court for appropriate further proceedings.

Finally, we turn to plaintiffs' claim that § 15-112 is vague in violation of the Fourteenth Amendment Due Process Clause. As an initial matter, we must determine whether plaintiffs have standing to pursue a due process challenge to § 15-112. As stated in a footnote to its decision, the district

court assumed, without deciding, that the plaintiffs have standing for purposes of their vagueness claim. It proceeded to decide the merits of the claim and grant summary judgment for defendants. However, before we proceed to the merits, we must first establish that we have jurisdiction to consider the due process claim.[11]

Defendants argue that plaintiffs have only a generalized interest in the validity of the law and, therefore, lack standing to pursue a vagueness claim. *See Hollingsworth v. Perry*, 133 S. Ct. 2652, 2662 (2013). They base this position on three arguments: (1) that plaintiffs cannot challenge the statute facially, because they have failed to show that the law is unconstitutional in every application, *see Schwartzmiller v. Gardner*, 752 F.2d 1341, 1346–47 (9th Cir. 1984); (2) that plaintiffs cannot challenge it as applied to them, because the statute targets the conduct of school districts and charter schools, not individuals, *see United States v. Backlund*, 689 F.3d 986, 997 (9th Cir. 2012); and (3) that plaintiffs have not identified any liberty or property interest that is protected by the Constitution and implicated by the challenged statute, *see Engquist v. Or. Dep't of Agric.*, 478 F.3d 985, 996 (9th Cir. 2007).

However, where the effect of a vague statute would infringe upon a party's First Amendment rights, standing requirements to challenge the statute under the Fourteenth Amendment Due Process Clause are broader than they

---

[11] As the issue of standing here is a question of law, not fact, we will assess whether we have jurisdiction rather than remanding the question to the district court. *Cf. Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 109–10 (1998) (assessing for itself whether a plaintiff had standing before engaging in the merits of the lower court's decision).

otherwise might be. *See Hynes v. Mayor & Council of Borough of Oradell*, 425 U.S. 610 (1976); *Maldonado v. Morales*, 556 F.3d 1037 (9th Cir. 2009). In *Hynes*, a local ordinance required anyone canvassing or calling house-to-house for a charitable or political purpose to give advanced notice to the local police. 425 U.S. at 611. The Supreme Court found that three registered voters could pursue a due process vagueness claim challenging the ordinance, even though they were not the individuals directly targeted by the statute. The Court found "[the voters'] right to receive information would be infringed because persons canvassing for political causes would be uncertain whether the ordinance covered them." *Id.* at 620, 621 n.5. We reached a similar outcome in *Maldonado*, where we recognized that "[a]lthough plaintiffs are generally limited to enforcing their own rights," standing is broader where a plaintiff's First Amendment rights are implicated. *See* 556 F.3d at 1044. "[A] plaintiff alleging that a statute is void for vagueness and overbreadth resulting in a chilling effect on speech has standing even if the law is constitutional as applied to him." *Id.* There, the plaintiff alleged constitutional challenges to a California statute that bars offsite commercial advertising on billboards along a landscaped freeway. *Id.* at 1040. The plaintiff had been cited numerous times for using a billboard on his property for offsite commercial advertising, and his lawsuit challenged both provisions of the statute that applied to him and provisions that did not. *Id.* at 1044. We found that he had standing to proceed with his void-for-vagueness claim even with respect to the provisions that did not apply to him, because the statute's alleged vagueness affected his First Amendment rights. *Id.* at 1044–46.

Here, as already suggested by our discussion of plaintiffs' First Amendment claims above, plaintiffs have a liberty

interest grounded in their First Amendment right to receive information. *See Krug v. Lutz*, 329 F.3d 692, 696–97 (9th Cir. 2003). In *Krug*, we held that a prison inmate had "a liberty interest in the receipt of his subscription mailings sufficient to trigger procedural due process guarantees," and that this liberty interest was rooted in the inmate's First Amendment rights. *Krug*, 329 F.3d at 696–97. Similarly here, if the statute is found to be vague on its face, or as applied to TUSD's MAS program, it will have a direct impact on plaintiffs' right to receive information. Accordingly, we find that plaintiffs have standing to challenge § 15-112 under the Fourteenth Amendment Due Process Clause. We now proceed to the merits of this claim.

A statute is impermissibly vague if it "fails to provide a reasonable opportunity to know what conduct is prohibited, or is so indefinite as to allow arbitrary and discriminatory enforcement." *United States v. Mincoff*, 574 F.3d 1186, 1201 (9th Cir. 2009). Plaintiffs argue that the phrases "resentment toward a race or class of people," A.R.S. § 15-112(A)(2), and "advocate ethnic solidarity instead of the treatment of pupils as individuals," A.R.S. § 15-112(A)(4), are vague because they have an insufficiently objective meaning and pose a danger of "ad hoc and subjective" enforcement. *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972). The district court rejected these (and other vagueness claims not pursued on appeal) by noting that when these phrases are viewed in the context of the entire statute, they provide a person of ordinary intelligence fair notice of what conduct is prohibited. *Id.* at 108, 112.

We agree. Due process "does not require 'impossible standards' of clarity." *Kolender v. Lawson*, 461 U.S. 352, 361 (1983) (quoting *United States v. Petrillo*, 332 U.S. 1, 7

(1947)). For many of the same reasons discussed in the overbreadth analysis above, and in light of the statute's purpose to reduce racism in schools, *see* A.R.S. § 15-111, we find that the phrases here in issue sufficiently give notice as to what conduct is prohibited and do not inherently invite arbitrary enforcement.

Plaintiffs primarily rely on the case of *Tucson Woman's Clinic v. Eden*, 379 F.3d 531 (9th Cir. 2004), where we held that a requirement that physicians treat patients "with consideration, respect, and full recognition of the patient's dignity and individuality" was vague in violation of due process, because the terms "consideration," "respect," "dignity," and "individuality" had widely varying meanings to different people. *Id.* at 554–55.[12] Unlike in *Tucson Woman's*, however, we do not find that the challenged phrases have widely varying meanings—especially in the context of the entire statute. Thus, the phrase "promotes resentment toward a race or class of people" reasonably targets classes or courses that are designed with the *intention* to promote resentment, or to invite racism in schools. Similarly, the phrase "advocate ethnic solidarity instead of the treatment of pupils as individuals" is not unconstitutionally vague, because "advocate" inherently implies an affirmative act and intent, and the conduct of advocating "ethnic solidarity" is prohibited only if it is done

---

[12] Defendants argue that *Tucson Woman's* is distinguishable, because it involved a criminal statute that is subject to stricter review. *See Vill. of Hoffman Estates v. Flipside*, 455 U.S. 489, 498–99 (1982). However, *Flipside* also states that "[if] . . . the law interferes with the right of free speech or of association, a more stringent vagueness test should apply." *Id.* at 499. Accordingly, we consider plaintiffs' claim under a more stringent test, given that the result of our analysis will implicate plaintiffs' First Amendment right to receive information.

*instead of* treating pupils as individuals. We agree with the district court that the juxtaposition of these phrases is sufficiently clear so that a teacher or school district could tailor its conduct to conform to the statute. For these reasons and the similar reasons in our discussion of the First Amendment overbreadth claims above, we affirm the district court's holding that subsections (A)(2) and (A)(4) are not vague in violation of the Fourteenth Amendment.[13]

Finally, and notwithstanding our directions to remand the equal protection and First Amendment viewpoint discrimination claims for further proceedings, we must review the district court's decision that § 15-112(A)(3) is severable from the rest of the statute, as it is the one provision we affirmatively have held to be unconstitutional. A statute's severability is determined under state law. *See Dep't of Treasury v. Fabe*, 508 U.S. 491, 509–10 (1993). Under Arizona law, severability "is a question of legislative intent." *State v. Pandeli*, 161 P.3d 557, 573 (Ariz. 2007). The question is whether the legislature would have enacted the statute without the unconstitutional provision, if it knew of the invalidity, or "as otherwise stated, [whether] the valid or invalid parts are not so intimately connected as to raise the

---

[13] Plaintiffs also fail to show that § 15-112 is vague as applied. They argue that material facts exist as to whether the statute's alleged lack of standards allowed defendants to enforce the statute in line with their own pre-formed biases about the MAS program. However, they conflate this argument with their equal protection selective enforcement arguments, in that they do not adequately explain how the allegedly vague words in the statute allowed for discriminatory enforcement in this instance. Arbitrary or discriminatory enforcement of a statute does not necessarily mean that the statute was vague. Accordingly, we affirm the district court's holding that the statute is not vague as applied to the MAS program.

presumption that the legislature would not have enacted the one without the other." *Id.*

The district court held that "there appears to be no reason to conclude that the other provisions of the statute could not be enforced without subsection (A)(3), nor is there any indication that the legislature would not have enacted the statute without subsection (A)(3)." *Acosta*, 2013 WL 871892, at \*10. We agree. Reviewing the statute on its face, the provisions of § 15-112 are not so intimately intertwined as to create a presumption that the legislature would not have enacted the statute without § 15-112(A)(3). Subsections (A)(1), (A)(2), and (A)(4) target different types of conduct and are individually enforceable without (A)(3).[14] Therefore, we affirm the district court's decision that § 15-112(A)(3) is severable from the rest of the statute.

In sum, we affirm the district court's rulings that § 15-112(A)(3) is unconstitutional in violation of the First Amendment but severable from the rest of the statute; that §§ 15-112(A)(2) and (A)(4) are not overbroad in violation of the First Amendment; and that §§ 15-112(A)(2) and (A)(4)

---

[14] Plaintiffs also point us to aspects of the legislative history where the sponsor of the bill and former Superintendent Horne comment on their goals to stop grouping students by race, and to drafts of § 15-112 that indicate when subsection (A)(3) was added to the bill. *See* H.B. 2281 S. Comm. Educ. Accountability and Reform Hearing at 2:43:03–13 (statement of Rep. Steve Montenegro); H.B. 2281 House Educ. Comm. Hearing at 1:31:18 (statement of Superintendent Horne); Montenegro Floor Amendment, H.B. 2281, 49th Leg., 2d Sess. (Ariz. 2010), *available at* http://www.azleg.gov//FormatDocument.asp?inDoc=/legtext/49leg/2r/adopted/h.2281sm.doc.htm&Session_ID=93. We are not persuaded that these isolated aspects of the legislative history show that the legislature would not have enacted § 15-112 without subsection (A)(3).

are not vague in violation of the Due Process Clause. We reverse the district court's grant of summary judgment for defendants on plaintiffs' equal protection claim and remand that claim for trial. Lastly, we remand plaintiffs' First Amendment viewpoint discrimination claim to the district court for further proceedings in accordance with this opinion. Each party shall bear its own costs on appeal.

**AFFIRMED** in part, **REVERSED** in part, and **REMANDED**.

---

CLIFTON, Circuit Judge, concurring in part and dissenting in part:

I agree with and concur in most of the majority opinion, but I have one significant disagreement that prevents me from concurring in full. The majority opinion concludes, at 14, that there are genuine issues of fact regarding whether the enactment and/or enforcement of A.R.S. § 15-112 was motivated at least in part by a discriminatory intent. It thus orders that the equal protection claim be remanded for trial. I agree that the equal protection claim should be remanded, but I cannot agree that Plaintiffs have already presented sufficient evidence to establish that there is a genuine dispute of material fact on that issue. We should simply remand for further proceedings, without precluding further consideration of summary judgment.

The majority opinion concludes, specifically, that sufficient evidence was presented to raise a genuine dispute as to whether the enactment and/or enforcement of the statute "was motivated, at least in part, by an intent to discriminate

against MAS students on the basis of their race or national origin." Majority op. at 22. In doing so, however, the majority opinion conflates antipathy toward Tucson's Mexican American Studies program ("MAS") with animus toward Mexican Americans more generally. They are not the same. The district court recognized that difference when it concluded that "the evidence indicates that Defendants targeted the MAS program, not Latino students, teachers, or community members who supported or participated in the program." The majority opinion ignores that distinction.

All of the evidence cited by the majority opinion to support its conclusion pertains specifically to the Tucson MAS program, not to general hostility toward Mexican Americans. The majority leans heavily, for example, on the observation that statute was enacted in response to complaints about the Tucson MAS program and has been enforced only against that program. *Id.* at 7 & 16. It cites a legislator's negative description of the Tucson MAS program and attacks on that program by other politicians. *Id*. at 19–20. But what it doesn't point to is evidence that supports the contention that the motivation for enacting or enforcing the statute was animus against Mexican Americans. That there was opposition to the Tucson MAS program does not prove that the opposition was ethnically animated.

The majority opinion notes Plaintiffs' statement that they would have introduced evidence to support that proposition if they had been given the opportunity to brief the equal protection claims under a summary judgment analysis. I agree that Plaintiffs should be given the opportunity to present that evidence, but we should not pretend that proof of that proposition is already in the record. As the record stands

now, there is not enough to justify the majority opinion's conclusion.

There could have been good reasons for public officials to oppose the Tucson MAS program without any racial animus whatsoever. The Tucson school district appealed the findings of Superintendent John Huppenthal that the program violated the statute, and following an evidentiary hearing, an administrative law judge found that the Tucson MAS program did, in fact, violate the statute. The judge concluded that the program had courses that violated § 15-112(A)(2) (promoting racial resentment) and (A)(4) (advocating ethnic solidarity instead of treating pupils as individuals). He concluded that the program had "courses designed for Latinos as a group that promote[] racial resentment against 'Whites.'" He found that evidence at the hearing "demonstrate[d] that MAS classes cause students to develop a sense or racial resentment toward the 'white oppressor' or 'dominant' group. The philosophy of 'us against them' is a persistent theme that exists within the MAS program."

Those conclusions are not before us for review, and I have no independent knowledge or basis to say whether they were accurate. But if a public official believed those charges to be true, that officeholder's opposition to the Tucson MAS program would not be surprising and would not itself demonstrate any discriminatory motivation. The majority opinion agrees with the district court's conclusion that the statute is not discriminatory on its face, and I agree as well. If so, then support for the statute, without any other proof of racial animus, does not prove discriminatory motivation.

I respectfully dissent from that portion of the majority opinion.